WEIDENBAUM & HARARI, LLP
Allan H. Carlin, Of Counsel (AC-4685)
Jack A. Harari (JH-3658)
708 Third Avenue -22nd Floor
New York, NY 10017
Telephone:  (212) 832-7400
Email:  jack@whfirm.com
            allan.carlin@verizon.net
*Attorneys for Plaintiff*

09  CV  8613

RECEIVED
OCT - 9 2009
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

GABRIEL MEYASSED & ESTHER MEYASSED,

                                        Plaintiff,

            -against-

LEV PARKVIEW DEVELOPERS, LLC,
a New York limited liability company, EDDIE
SHAPIRO, MATI WEIDERPASS, IAN REISNER,
RON YEFFET, and STARR ASSOCIATES, LLP, as
Escrow Agent,

                            Defendants.

------------------------------------------------------------------

Civil Action No.

**COMPLAINT**

## **COMPLAINT**

    The plaintiffs, Gabriel Meyassed and Esther Meyassed (the "MEYASSED"), by and

through her attorneys, Weidenbaum & Harari, LLP, as and for her Complaint against the

defendants, Lev Parkview Developers, LLC (the "Developer"), Eddie Shapiro ("Shapiro"), Mati

Weiderpass ("Weiderpass"), Ian Reisner ("Reisner"), and Ron Yeffet ("Yeffet") (with Shapiro,

Weiderpass, Reisner and Yeffet hereinafter collectively referred to as the "Individual

Developers"), and Starr Associates, LLP ("Starr Associates" or "Escrow Agent"), alleges as

follows:

## SUMMARY OF THE ACTION

1.      This action relates to the protections afforded purchasers of condominium units under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* (the "Act"), pursuant to which the developer of a newly constructed condominium is required, under certain circumstances, to file a statement of record meeting the requirements of 15 U.S.C. § 1705 (the "Statement of Record") with the U.S. Department of Housing and Urban Development ("HUD"), and to deliver a copy of a property report (the "Property Report") to purchasers of units in the condominium in advance of the purchaser's execution of a purchase agreement.  The Property Report contains portions of the Statement of Record as specified in 15 U.S.C. § 1707.  If the developer fails to fulfill this statutory obligation of delivering the Property Report to purchasers in advance of execution of the purchase agreement, any such purchaser has the right to revoke the purchase agreement for a period of up to two (2) years after its execution, and to obtain an award of damages, including attorney's fees.

2.      The Defendants offered units (the "Units") for sale in a condominium known as The 505 Condominium located at 505 West 47th Street, New York, NY 10036 (the "Condominium") pursuant to an Offering Plan initially filed with the New York Department of Law on or about October 5, 2008 (the "Plan"), and thereafter amended eleven times, most recently by the filing of the Eleventh Amendment to the Plan or about April 29, 2009 (the "Eleventh Amendment").   Plaintiffs executed an agreement to purchase Unit 5E-N on January 14, 2008.

3.      While no reference whatsoever to the existence of the Act had previously been made in the Plan, as amended, the Defendants, in the Eleventh Amendment, asserted that the Condominium was "entirely exempt" from the Act based upon a new commitment by the

Defendants, as disclosed in the Eleventh Amendment, to complete the construction of the last eight (8) Units within two years of the execution of an agreement to purchase these eight Units. However, this construction commitment did not exist when the Plaintiffs executed their agreement to purchase Unit 5E-N and no basis exists for any claim that the Condominium was exempt from the requirements of the Act when the Plaintiffs executed their purchase agreement. The Defendants have violated the Act by their failure, among other things, to file a Statement of Record with HUD and deliver a Property Report to the Plaintiffs in advance of their execution of an agreement to purchase a Unit, and pursuant to the Act, the Plaintiffs are accordingly entitled, among other rights and remedies, to revoke their purchase agreement. The Plaintiffs have exercised their express rights under the Act to revoke their respective purchase agreement. Based on these facts and circumstances, the Plaintiffs seek judgment enforcing their statutory rights, including rescission of their agreement to purchase a Unit, return of the deposits paid by the Plaintiffs upon their execution of the purchase agreement, and an award of counsel fees and the costs of this action.

## **THE PARTIES**

4.      Plaintiffs Gabriel and Ester Meyassed are citizens of Israel who reside at Harofe 17, Haifa, 34367, ISRAEL.

5.      Upon information and belief, Defendant Lev Parkview Developers, LLC is a New York limited liability company with a principal place of business at 1230 Avenue of the Americas, 7th Floor, New York, New York 10020, and is the Sponsor of the Plan.

6.      At all relevant times, Defendant Eddie Shapiro was and still is a principal of Developer.  In connection with the Plan, Shapiro executed a Certification of Sponsor and

Principals in which he represented that he is one of the individuals who has primary responsibility for compliance with all laws and regulations as may be applicable.

7.     At all relevant times, Defendant Matt Weiderpass was and still is a principal of Developer.  In connection with the Plan, Weiderpass executed a Certification of Sponsor and Principals in which he represented that he is one of the individuals who has primary responsibility for compliance with all laws and regulations as may be applicable.

8.     At all relevant times, Defendant Ian Reisner was and still is a principal of Developer.  In connection with the Plan, Reisner executed a Certification of Sponsor and Principals in which he represented that he is one of the individuals who has primary responsibility for compliance with all laws and regulations as may be applicable.

9.     At all relevant times, Defendant Ron Yeffet was and still is a principal of Developer.  In connection with the Plan, Yeffet executed a Certification of Sponsor and Principals in which he represented that he is one of the individuals who has primary responsibility for compliance with all laws and regulations as may be applicable.

10.     The Developer and the Individual Developers are a "developer" within the meaning of 15 U.S.C. § 1701(5).

11.     Defendant Starr Associates, LLP ("Escrow Agent") is a law firm organized under the New York limited liability partnership law, maintains its principal place of business at 245 Fifth Avenue, Suite 1102, New York, New York 10016, and is the Escrow Agent pursuant to the terms of the Purchase Agreement and the Plan.  Upon information and belief, Escrow Agent has also acted as counsel to Developer in connection with the preparation of the Plan, as amended to date, and the Purchase Agreement.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction of the federal questions and violations of federal law alleged herein under the Act, 15 U.S.C. § 1701 *et seq.* and 28 U.S.C. § 1331.

13.     Upon information and belief, this Court has personal jurisdiction over the Defendants because each Defendant transacts substantial and continuous business in the State of New York and in this District.  In addition, the Defendants' conduct, which constitutes violation of the Act, occurred in this District and has caused harm in this District.

14.     Venue in this district is proper under 28 U.S.C. § 1391(b)-(c).

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, mails and electronic means of data and voice communication.

**STATEMENT OF FACTS**

16.     The Defendants offered and sold the Unit pursuant to the Plan, as initially filed on or about October 3, 2007 pursuant to the New York Condominium Act (New York Real Property Law, Article 9-B), and as thereafter amended eleven times, with the Eleventh Amendment having been filed on April 29, 2009.

17.     On or about January 14, 2008, the Plaintiffs' agreement to purchase Unit 5E-N (the "Purchase Agreement") was fully executed by the Plaintiffs and the Developer.  A copy of the Purchase Agreement is attached hereto as Exhibit A and is incorporated by reference into this Complaint.  The terms and provisions of the Purchase Agreement are identical in all pertinent respects to the form purchase agreement included in Part II of the Plan.

18.    Pursuant to the Purchase Agreement, Plaintiffs paid Developer a deposit of ten (10%) percent of the purchase price of the Unit (the "Deposit"). The Deposit paid by Plaintiffs was $71,000.

19.    At the time Plaintiffs executed the Purchase Agreement, the Plan disclosed that the Condominium consisted of 108 Units, excluding one (1) resident manager's Unit. Although numerous exemptions from the requirements of the Act are available, only two (2) exemptions are relevant in the facts and circumstances of this action: (a) the so-called "100 Lot Exemption" under 15 U.S.C. 1702(b)(1), pursuant to which the offer and sale of less than 100 units under a "common promotional plan" is exempt; and (b) the so-called "two years improvement exemption" under 15 U.S.C. §1702(a)(2), pursuant to which units which the developer has unconditionally agreed to substantially complete within two years are exempt.

20.    The Defendants apparently were unaware of the existence of the Act at the time the Plaintiffs entered into the Purchase Agreement. The Plan, as amended through the date the Plaintiffs executed the Purchase Agreement, makes no reference whatsoever to the Act. However, the Defendants apparently learned of the Act sometime after the filing of the Tenth Amendment on or about October 3, 2008, prompting the file of the Eleventh Amendment, which disclosed, for the first time, that sponsors of certain new construction condominiums are required under the Act to file a Property Report with HUD and to provide the Property Report to purchasers of Units. The Eleventh Amendment further acknowledges that unless an exemption under the Act applies, "the Report must be provided to prospective purchasers in advance of or contemporaneous with the purchaser executing a purchase agreement." (emphasis supplied) As expressly acknowledged by the Eleventh Amendment, "No prior disclosures regarding the Act

6

and its requirement have been included in the Plan or in the form purchase agreement included in Part II of the Plan."

21.     In an effort to avoid application of the Act to the Condominium, the Defendants disclosed in the Eleventh Amendment that it had: (a) combined two Units into a single Unit, thereby reducing the total number of Units to 107 (excluding the Unit for the manager's residence); and (b) agreed to substantially complete construction of the last eight (8) Units within two (2) years of execution of a purchase agreement, thereby purportedly satisfying the requirements of the "two year improvement exemption" with respect to those eight Units. Based upon the exclusion of these supposedly exempt 8 Units from the total of 107 Units under the Plan, the Defendants asserted that the balance of only 99 Units qualified for the so-called "100 Lot Exemption" under the Act, and that the Condominium was therefore "entirely exempt" from the requirements of the Act. In that regard, the Eleventh Amendment stated as follows:

> Sponsor asserts that the Condominium is exempt from the requirements of the Act inasmuch as the sale of the 108 Residential Units falls within a combination of two exemptions under the Act. The sale of the first ninety nine (99) Residential Units qualify for an exemption under what is commonly known as the "100 Lot Exemption." Annexed hereto as Exhibit "C" is a form Rider to the Purchase Agreement which will be annexed to each Purchase Agreement for the sale of the last eight (8) Residential Units in the Condominium, which will exempt these transactions from the Act in accordance with what is commonly known as the "Improved Lot Exemption." The Rider provides that Sponsor undertakes to complete construction of such Residential Unit within two (2) years from execution of the Rider. Sponsor is of the opinion that the "Improved Lot Exemption" combined with the "100 Lot Exemption" render the condominium entirely exempt from the Act.

22.     Irrespective of whether the Condominium may be exempt from the requirements of the Act with respect to offers and sales of Units made after the filing of the Eleventh Amendment on April 29, 2009, the Condominium was not exempt from the Act's requirements when the Plaintiffs executed the Purchase Agreement. At that time, the Units did not qualify for

7

the "two year improvement exemption," with Section 17.4 of the Purchase Agreement expressly providing, among other things, that the date for the first closing on the sale of a Unit is not guaranteed or warranted, and that the units would be completed at varying times over a period could extend "well beyond" the date of the first closing on the sale of a Unit.[1] Nothing in the Plan, as amended through the date of the Purchase Agreement, obligated Defendants to substantially complete construction of any Unit within two years from the date of the Purchase Agreement. Therefore, the Plan covered more than 100 Units at the time that the Purchaser executed her Purchase Agreement, and the Condominium was subject to all of the requirements of the Act at the time when the Purchaser executed her Purchase Agreement.

### FIRST CAUSE OF ACTION

23.     Plaintiffs hereby incorporate by reference and re-allege paragraphs 1 to 22 above as though fully set forth herein.

24.     This cause of action is brought pursuant to 15 U.S.C § 1709.

25.     The Plaintiffs are purchasers within the meaning of that term in 15 U.S.C. 1701(10), who executed a Purchase Agreement for the purchase of a Unit.

26.     The Plan is a "common promotional plan" as defined by § 1701(4) of the Act.

---

[1]  Section 17.4 of the Purchase Agreement provides in full as follows:

The actual date for the First Closing is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites recited in the Section of the Plan entitled "Closing of Title to Units." Purchaser acknowledges that construction may be delayed by late delivery of material or equipment difficulties, unavailability of Building trades, casualty, inclement weather and other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the Units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these Units will be completed is in the discretion of Sponsor. Purchaser acknowledges that except as otherwise provided in the Plan, Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, in the event that the First Closing occurs substantially later than the projected date or the time to complete or to close title to the Unit is delayed or is postponed by Sponsor.

27.     The Defendants did not attempt to qualify the Condominium for an exemption under 15 U.S.C. § 1702 as of the date upon which the Plaintiffs executed the Purchase Agreement.

28.     As set forth in the Eleventh Amendment dated April 29, 2009, the Defendants are relying upon the "two year improvement" exemption under 15 U.S.C. § 1702(a)(2) and the "100 Lot Exemption" under 15 U.S.C. 1702(b)(1) for purposes of claiming that the Condominium is exempt from the requirements of the Act.

29.     Based upon the content of the Purchase Agreements in general, and Section 17.4 thereof in particular, the Defendants failed to unconditionally guarantee completion of any Units within two years of Plaintiffs' execution of the Purchase Agreement.

30.     The Defendants did not qualify the Condominium for an exemption under 15 U.S.C. § 1702 as of the date upon which the Plaintiffs executed the Purchase Agreement, and the requirements of the Act were applicable to the Defendants in connection with their offer and sale of the Unit to the Plaintiffs, including, without limitation, the Defendants' obligations to provide the Plaintiffs with a Property Report.

31.     Pursuant to 15 U.S.C. § 1703(a), the Defendants were obligated to file a Statement of Record relating to the Condominium, and such Statement of Record was required to be effective prior to the Plaintiffs' execution of the Purchase Agreement.

32.     In violation of 15 U.S.C. § 1703(a), the Defendants failed to file a Statement of Record relating to the Condominium, and no such Statement of Record was in effect prior to the Plaintiffs' execution of the Purchase Agreement.

33.     Pursuant to 15 U.S.C. § 1703(a), the Defendants were obligated to give a Property Report to the Plaintiffs prior to the Plaintiffs' execution of the Purchase Agreement.

34.     In violation of 15 U.S.C. § 1703(a), the Defendants failed to give the Plaintiffs a Property Report prior to the Plaintiffs' execution of the Purchase Agreement.

35.     Pursuant to 15 U.S.C. § 1703(b), the Purchase Agreement was required to clearly provide that the Purchase Agreement may be revoked at the option of the purchaser until midnight of the seventh day following the signing of the Purchase Agreement.

36.     In violation of 15 U.S.C. § 1703(b), the Purchase Agreement does not contain the required provision, as described above, relating to the purchaser's revocation rights.

37.     Based upon the failure of the Defendants to give a Property Report to the Plaintiffs prior to their execution of the Purchase Agreement, the Plaintiffs have an express right under 15 U.S.C. § 1703(c) to revoke the Purchase Agreement within two years of their signature thereof.

38.     Based upon the omission from the Purchase Agreement of certain provisions required by 15 U.S.C. § 1703(d) and the failure of the Defendants to deliver a deed to the Plaintiffs within 180 days from the date of her signature of the Purchase Agreement, the Plaintiffs have an express right under 15 U.S.C. § 1703(d) to revoke the Purchase Agreement within two years of their signature thereof.

39.     On or about October 7, 2009, the Plaintiffs notified the Developer in writing of the exercise of their statutory right to revoke the Purchase Agreement.

40.     The Plaintiffs' exercise of their rights to revoke the Purchase Agreement was timely under 15 U.S.C. § 1703.

41.     In view of the foregoing, and pursuant to 15 U.S.C. § 1703(e), the Plaintiffs are entitled to be repaid all sums paid by them under the Purchase Agreement.

42.     To date, the Defendants have not acknowledged the rights of the Plaintiffs to revoke the Purchase Agreement, and have failed to repay to the Plaintiffs the Deposit paid by them under the Purchase Agreement.

43.     Pursuant to 15 U.S.C. § 1709(b), the Plaintiffs are entitled to bring an action to enforce their rights under subsections (b), (c), (d) and (e) of 15 U.S.C. § 1703.

44.     Under 15 U.S.C. § 1709(c), the Plaintiffs, as the purchaser of a Unit, may also recover interest, court costs, and reasonable attorney fees.

WHEREFORE, Plaintiffs respectfully request judgment, in accordance with the remedies under 15 U.S.C. §§ 1709(b) and (c), against the Defendants as follows:  (a) rescission of the Purchase Agreement executed by Plaintiffs and return of the Deposit of $71,000, plus accrued interest thereon; (b) an award to Plaintiffs of their reasonable attorneys' fees and court costs; and (c) an award to Plaintiffs of such other and further relief as the Court deems just and proper.

Dated: New York, NY
       October 9, 2009

WEIDENBAUM & HARARI, LLP

By: _____
Allan H. Carlin, Of Counsel (AC-4685)
Jack A. Harari (JH-3658)
708 Third Avenue -22nd Floor
New York, NY 10017
Telephone:  (212) 832-7400
Email: jack@whfirm.com
        allan.carlin@verizon.net

*Attorneys for Plaintiff*

11

# Exhibit A

*need outside date. If seller has
not obtained TCO, cannot close by ___
Purchaser shall have the option to terminate &
if so exercised, D.P. refunded in 5 days.*

---

## PURCHASE AGREEMENT

---

Lev Parkview Developers, LLC

Sponsor

With

**GABRIEL & ESTHER MEYASSED**

Purchaser

---

Unit Number 5E-N

**THE 505 CONDOMINIUM**
**505 WEST 47TH STREET**
**NEW YORK, NEW YORK 10036**

---

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| 1. THE PLAN | 1 |
| 2. DEFINITIONS | 1 |
| 3. THE UNIT | 2 |
| 4. PURCHASE PRICE | 2 |
| 5. DEPOSIT TO BE HELD IN TRUST | 2 |
| 6. CLOSING DATE AND PLACE | 3 |
| 7. DELIVERY OF THE DEED AND UNIT POWER OF ATTORNEY | 3 |
| 8. STATUS OF TITLE | 4 |
| 9. CLOSING ADJUSTMENTS | 4 |
| 10. MORTGAGE TAX CREDIT | 5 |
| 11. CLOSING COSTS | 5 |
| 12. AGREEMENT NOT A LIEN OR ENCUMBRANCE | 6 |
| 13. DEFAULT BY PURCHASER | 6 |
| 14. AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE | 7 |
| 15. SPONSOR'S INABILITY TO CONVEY THE UNIT | 7 |
| 16. FIXTURES, APPLIANCES AND PERSONAL PROPERTY | 7 |
| 17. NEW CONSTRUCTION | 8 |
| 18. INSPECTION OF THE UNIT | 8 |
| 19. DAMAGE TO THE UNIT | 9 |
| 20. NO REPRESENTATIONS | 9 |
| 21. PROHIBITION AGAINST ADVERTISING | 10 |
| 22. BROKER | 10 |
| 23. AGREEMENT MAY NOT BE ASSIGNED | 10 |
| 24. BINDING EFFECT | 10 |
| 25. NOTICES | 11 |
| 26. JOINT PURCHASERS | 11 |
| 27. LIABILITY OF SPONSOR | 11 |
| 28. FURTHER ASSURANCES | 11 |
| 29. AGREEMENT NOT CONTINGENT UPON FINANCING | 12 |
| 30. COSTS OF ENFORCING AND DEFENDING AGREEMENT | 12 |
| 31. SEVERABILITY | 12 |
| 32. STRICT COMPLIANCE | 12 |
| 33. GOVERNING LAW | 12 |

34. WAIVER OF JURY ........................................................................................12

35. ENTIRE AGREEMENT ................................................................................12

36. CERTAIN REFERENCES .............................................................................13

37. CAPTIONS ..................................................................................................13

38. SUCCESSORS AND ASSIGNS .....................................................................13

39. CONFIDENTIALITY ....................................................................................13

40. LETTER OF CREDIT IN LIEU OF DEPOSITS IN ESCROW .........................13

41. NO ORAL CHANGES ..................................................................................13

42. PERFORMANCE .........................................................................................13

43. COUNTERPARTS ........................................................................................14

44. WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY............................14

SCHEDULE A – PERMITTED ENCUMBRANCES

SCHEDULE B – INSPECTION STATEMENT

# PURCHASE AGREEMENT

## UNIT NUMBER 5E-N

### THE 505 CONDOMINIUM
### 505 WEST 47TH STREET
### NEW YORK, NEW YORK 10036

AGREEMENT, made as of **JAN 1 4 2008** , between Sponsor and Purchaser (defined below).

### W I T N E S S E T H :

## 1.    THE PLAN

Purchaser acknowledges having received and read a copy of the Offering Plan for The 505 Condominium and all amendments thereto, if any, filed prior to the date hereof with the Department of Law of the State of New York (hereinafter, collectively, referred to as the "Plan") at least 3 business days prior to Purchaser's signing this Agreement. If Purchaser has not received and read the Plan and all amendments thereto at least 3 business days prior to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement, by sending written notice of such rescission to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within 7 days from the date Purchaser delivers an executed Purchase Agreement together with the required Deposit to the Selling Agent. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding. Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, By-laws and Residential Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor. *Updated Amendments to be forwarded upon filing*

## 2.    DEFINITIONS

Terms used herein which are also used in the Plan shall have the same meanings as they do in the Plan, unless the context requires otherwise.

2.1    "Sponsor" means Lev Parkview Developers, LLC, having an office at 1230 Avenue of the Americas, 7th Floor, New York, New York 10020. Sponsor's taxpayer identification number is 20-4528508.

2.2.    "Purchaser" means <u>Gabriel and Esther Meyassed</u> having an address at <u>Harofe 17, Haifa 34367, ISRAEL</u>. Purchaser's social security number is <u>N/A</u>. *— or a trust or corp. to be formed.*

2.3    "Attorney for Sponsor" means Starr Associates LLP, having an address at 245 Fifth Avenue, Suite 1102, New York, New York 10016; Attention: Samantha Sheeber, Esq. and Sydney Levine, Esq.; Telephone Number: (SS) 212-620-2682, (SL) 212-620-2675. Facsimile Number: (212) 696-5013. Email: ssheeber@starr-lawfirm.com, slevine@starr-lawfirm.com.

2.4    "Attorney for Purchaser" means <u>June Cohen Esquire</u>, having an address at <u>2526 Wallace Avenue, Bronx, NY 10467.</u> Attention: <u>June Cohen</u>, Esq. Telephone Number: <u>(718)547-6400.</u> Facsimile Number <u>(718)547-9410.</u> E-mail address: <u>jcohenesq@yahoo.com.</u>

2.5    "Selling Agent" means either

2.5.1   Halstead Property Development Marketing LLC, having an address at 831 Broadway, New York, New York 10003.  Telephone Number: (212) 381-4203.  Facsimile Number: (212) 381-2408; or

2.5.2   Nest Seekers, LLC, having an address at 20 East 49th Street, New York, New York 10017.  Telephone Number: (212) 252-8772.  Facsimile Number: (212) 252-9347.

2.6   "Co-Broker" means Homes Direct LLC. ~ KIM NAHUM CHESLOW

2.7   "Escrow Agent" means Attorney for Sponsor.

2.8   "Title Company" means Fidelity National Title Insurance Company, having and office at One Park Avenue, New York, New York 10016.  Telephone Number: (212) 481-5858.  Facsimile Number: (212) 481-5996.

## 3.   THE UNIT

Upon and subject to the terms and conditions set forth herein, Sponsor agrees to sell and convey, and Purchaser agrees to purchase the Unit designated as Unit 5E-N in the Declaration, together with its undivided .7918% interest in the Common Elements appurtenant to such Unit ("Unit").

## 4.   PURCHASE PRICE

4.1   The Purchase Price for the Unit ("Purchase Price") is $710,000.00.

The Purchase Price is payable as follows:

(a)   $71,000.00, (the "Deposit"), due upon Purchaser's signing and submitting this Agreement, by check (subject to collection), receipt of which is hereby acknowledged; and

(b)   $639,000.00 (the "Balance of the Purchase Price"), by good certified check of Purchaser or official bank check, payable on the delivery of the deed as hereinafter provided.

4.2   All checks shall represent United States currency, be drawn on or issued by a United States Bank or trust company which is a member of the New York Clearing House Association and shall be unendorsed.  The Deposit shall be made payable to the direct order of "Starr Associates LLP, as Escrow Agent."  The Balance shall be made payable to the direct order of "Lev Parkview Developers, LLC"(or such other party as Sponsor directs to Purchaser, in writing, at least 1 business day prior to the date of Closing of Title).  If any check is returned for insufficient funds or any other reason, such return shall be deemed to be a default by Purchaser under this Agreement and shall entitle Sponsor to exercise any of the remedies set forth in Article 13 hereof. Notwithstanding the foregoing, if the check representing the Deposit is returned for insufficient funds or any other reason, such return shall be deemed to be a non-curable default by Purchaser and this Agreement shall automatically be deemed cancelled.  Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

## 5.   DEPOSIT TO BE HELD IN TRUST

All Deposits made pursuant to this Agreement are subject to the requirements of Sections 352-e(2)(b) and 352-h of the New York General Business Law and the Attorney General's regulations promulgated pursuant thereto.  All monies received from Purchaser towards the Deposit shall be delivered to Escrow Agent and shall be held in accordance with the Section of the Plan entitled "Escrow and Trust Fund Requirements."  By signing this Agreement, Purchaser will not object and will be deemed to have agreed,

without the need for a further written agreement, to the release of the Deposit to Sponsor in the event Sponsor and Purchaser close title under this Agreement. If Purchaser shall default on Purchaser's obligations under this Agreement, then the Deposit shall be released to Sponsor as liquidated damages, and thereafter, neither party shall have any further rights or obligations against or to each other. In the event Sponsor cannot convey title to the Unit to Purchaser by reason other than Purchaser's default, the Deposit shall be returned to Purchaser, within 30 business days of Sponsor's notification to Purchaser that it cannot convey title.

### 6.   CLOSING DATE AND PLACE

6.1   The Closing of Title shall be held at the offices of Starr Associates LLP, 245 Fifth Avenue, Suite 1102, New York, New York (or such other place in the City and ~~State~~ of New York as Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than 30 days' prior written notice ("Initial Closing Notice"). If Sponsor consents to close at any other location as an accommodation to Purchaser, Purchaser shall pay to Attorney for Sponsor at Closing an extra fee as set forth in the Plan. After the Initial Closing Notice, Sponsor may, from time to time, adjourn and reschedule the date and hour for closing on not less than 5 business days notice to Purchaser, which new closing notice shall fix a new date, hour and place for the Closing of Title and which date shall not be earlier than the date set forth in the Initial Closing Notice. Only the Initial Closing Notice shall require 30 days' prior written notice. *↓ New closing notice shall provide at least 10 days notice*

6.2   The term "Closing Date" "Closing" "Closing of Title" or words of similar import, whenever used herein, shall mean the date on which the deed to the Unit is delivered to Purchaser.

### 7.   DELIVERY OF THE DEED AND UNIT POWER OF ATTORNEY

7.1   At the Closing of Title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying fee simple title to the Unit to Purchaser, subject only to the liens, encumbrances, and title conditions set forth on Schedule A annexed hereto and made a part hereof. The deed shall be prepared by Sponsor substantially in the form set forth in Part II of the Plan and shall be executed and acknowledged by Sponsor in form for recording. Purchaser shall pay all New York State and New York City real property transfer taxes, and Sponsor and Purchaser shall duly complete and execute before a notary public the New York City and New York State Transfer Tax Return Forms and any other forms then required by law, all of which shall be prepared by Sponsor.

7.2   At the Closing of Title and simultaneously with the delivery of the deed conveying the Unit to Purchaser, Purchaser shall execute and acknowledge a power of attorney to the Condominium Board prepared by Sponsor substantially in the form set forth in Part IV of the Plan, as well as whatever other documents are reasonably necessary or customary in connection with the conveyance of a condominium unit, including but not limited to title affidavits, real property transfer tax forms, etc.

7.3   The executed deed, transfer tax forms and power of attorney shall be delivered at the Closing to the representative of the Title Company insuring Purchaser's title (or, if no such representative is present, then to the Attorney for Sponsor) for recording in the Office of the City Register, which recording shall be at Purchaser's expense. After being recorded the deed shall be returned to Purchaser and the power of attorney shall be returned to the Condominium Board.

7.4   Purchaser's payment of the Balance of the Purchase Price and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the Closing, and nothing herein shall be in derogation of the rights of purchasers under Article 23-A of the General Business Law, the Plan, and Part 20 of the Regulations issued

by the Department of Law, including but not limited to, the right to rescind this Agreement under certain circumstances as set forth in the Plan and Part 20 of the Regulations issued by the Department of Law.

8.      **STATUS OF TITLE**

8.1      At the Closing of Title, Sponsor shall convey to Purchaser fee simple title to the Unit, free and clear of all liens and encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule A annexed hereto and made a part hereof. Any lien and encumbrance or condition to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the Closing of Title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) Fidelity National Title Insurance Company (or such other title insurance company as Purchaser may utilize), is or would be willing, in a fee policy issued by it to Purchaser, to insure Purchaser that it will not be collected out of the Unit if it is a lien, or will not be enforced against the Unit if it is not a lien. Sponsor shall not be obligated to cause Purchaser's title company to omit any exceptions if the Title Company is willing to insure, without additional premium, Purchaser's title with such exception.

8.2      Sponsor shall be entitled to adjourn the Closing to remove or correct any defect in title which is not set forth in Schedule A. However, if such defect existed at least 10 days prior to the Closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least 10 days prior to the Closing of Title, then, for purposes of Article 13 below, Purchaser shall be deemed  at fault for not having sent timely notice, and the Closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

8.3      If, subsequent to the Closing of Title, Purchaser claims that Sponsor did not convey fee simple title to the Unit in accordance with the Plan, Purchaser must first seek recovery against Purchaser's title insurance company before proceeding against Sponsor. Sponsor and Purchaser agree that Sponsor's liability will be limited to any loss or damage not covered by Purchaser's title insurance company. If Purchaser did not obtain title insurance at the Closing, for purposes of this subparagraph, the amount and coverage which Purchaser could have obtained from Purchaser's title insurance company shall be deducted from the loss or damage collectable against Sponsor. Nothing contained in this subparagraph shall be construed to waive any of Purchaser's rights or abrogate any of Sponsor's obligations under the Plan or Article 23-A of the General Business Law.

9.      **CLOSING ADJUSTMENTS**

9.1      The following adjustments shall be made as of midnight of the day preceding the Closing Date with respect to the Unit:

(a)      real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed;

(b)      Common Charges (if Common Charges have been assessed by the Condominium Board) and assessments for the month in which title closes; and

(c)      if Purchaser is allowed to occupy the Unit prior to Closing, accrued rent and any other charges pursuant to a use and occupancy agreement, if any, covering the Unit.

9.2      If the Unit has been separately assessed for real estate taxes but the Closing of Title occurs before the tax rate is fixed, adjustment of real estate taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation. Installments for real estate tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser and shall not be considered a defect in title. If the Unit has not been separately assessed for real estate taxes as of the Closing Date for the then current tax period, the adjustment under subsection 9.1(a) hereof shall be based upon the assessment for the Property and the

percentage interest in the Common Elements appurtenant to the Unit. In addition, Purchaser shall pay the Unit's proportionate share of real estate taxes for the next ensuing tax period and Sponsor or the Condominium will pay such real estate taxes directly to the City of New York. Sponsor shall not be obligated to reimburse Purchaser after the Closing on account of any difference between the amount of real estate taxes for the then current tax period paid by Purchaser at Closing calculated according to the above formula and the amount of real estate taxes subsequently billed by the City of New York to such Purchaser (as Unit Owner).

9.3     Purchaser agrees that, if Sponsor obtains a refund for real estate taxes paid (or a credit for such real estate taxes to be paid) on Purchaser's Unit, Purchaser and Sponsor will apportion the refund (as well as the costs and/or fees for obtaining the refund or credit) based on the percentage of time for which the refund or credit is obtained during which each party hereto owned the Unit in question. The provisions of this subsection shall survive the Closing of Title.

9.4     Provided Sponsor is ready, willing and able to close title in accordance with this Agreement, if Purchaser fails for any reason to close title to the Unit on the originally scheduled Closing Date (a) the Closing apportionments described in Section 9.1 of this Agreement will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual Closing of Title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to 0.03% of the Purchase Price for each day starting from (and including) the originally scheduled Closing Date to (and including) the day before the actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date. *provided purchaser has 10 days notice of new closing date*

9.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect of Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned except as otherwise provided herein in the Plan.

9.6     Any errors or omissions calculating apportionments at Closing shall be corrected and, any payment shall be made to the proper party promptly after discovery. This provision shall survive the Closing of Title.

## 10.     MORTGAGE TAX CREDIT

In the event a mortgage recording tax credit becomes available pursuant to Section 339- ee(2) of the New York Condominium Act, it is specifically understood that such credit shall enure to the benefit of Sponsor. Accordingly, at Closing, a Purchaser who elects mortgage financing will be responsible to pay the full amount (but not in excess thereof) of the mortgage recording tax chargeable on the entire amount being financed. At the Closing of Title, Sponsor will be reimbursed by Purchaser to the extent of any mortgage tax credit allowed.

## 11.     CLOSING COSTS

In addition to those costs and adjustments described in Articles 9 and 10 herein, Purchaser shall be required to pay the other closing costs which are Purchaser's responsibility as more particularly described in the Section of the Plan entitled "Closing Costs and Adjustments." All such Closing Costs shall be paid by Purchaser, at Closing, by Purchaser's unendorsed personal certified check or by official bank check, in either event drawn upon a bank that is a member of the New York Clearing House Association.

**12.    AGREEMENT NOT A LIEN OR ENCUMBRANCE**

No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall be subject and subordinate to the lien of any mortgage heretofore or hereafter made, including, but not limited to, any construction or Building loan mortgage, and any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser. This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage(s) is subordinated to the Declaration.

**13.    DEFAULT BY PURCHASER**

13.1    The following shall constitute "Events of Default" hereunder:

(i)    Purchaser's failure to pay the Balance of the Purchase Price, or any closing adjustment or closing cost required to be paid by Purchaser as set forth in the Plan or in this Agreement, or the dishonor of any check given by Purchaser to Sponsor; or

(ii)    Purchaser's failure to pay, perform or observe any of Purchaser's other obligations under this Agreement or the Plan; or

(iii)    if Purchaser is permitted to become the tenant or occupant of the Unit, Purchaser's failure to pay rent or to otherwise comply with some other lease or occupancy obligation; or

(iv)    Purchaser's assignment or transfer of any of Purchasers property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(v)    if a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vi)    if a judgment or tax lien is filed against Purchaser and Purchaser does not pay or bond the judgment or lien; or

(vii)    Purchaser's assignment of this Agreement without the prior written consent of Sponsor; or

(viii)    Purchaser's listing the Unit for resale or rental with any broker or advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale or rental without Sponsor's prior written consent; or

(ix)    an Event of Default by Purchaser beyond any applicable grace period under a Purchase Agreement between Purchaser and Sponsor for another Unit at the Property.

13.2    **TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Balance of the Purchase Price and to pay, perform or comply with Purchaser's other obligations under this

Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to either (i) cancel this Agreement or (ii) seek specific performance. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, the entire Deposit and any interest earned on the Deposit. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale. If Sponsor elects to seek specific performance, then Purchaser shall have 30 days from the giving of notice of Sponsor's election to close on the Unit in accordance with this Agreement, without prejudice to Sponsor's right to recover from Purchaser all damages, losses, costs, expenses and all other lawful sums to which Sponsor is entitled (including, but not limited to, reasonable fees and costs of collection).

14.    **AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE**

The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan. The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if, after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this Agreement shall be deemed cancelled and the Deposit, together with interest earned thereon, shall be returned to Purchaser. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

15.    **SPONSOR'S INABILITY TO CONVEY THE UNIT**

If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan by reason of a defect in title, substantial damage or destruction of the Building by fire or other casualty, or the taking of any material portion of the Property by condemnation or eminent domain, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election or inability to cure such title defect, and if Purchaser is not in default hereunder, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser so elects to terminate this Agreement, Sponsor shall, within 30 days after receipt of notice of termination from Purchaser, return to Purchaser all Deposits and all other sums deposited by Purchaser hereunder, together with interest earned thereon, if any. Upon making such payment, this Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Agreement or the Plan. The foregoing remedy must be exercised by notice of Purchaser in writing to Sponsor within 15 days after the giving of Sponsor's notice of election not to cure such inability, ~~failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above (i.e., to acquire title subject to such inability).~~ business

16.    **FIXTURES, APPLIANCES AND PERSONAL PROPERTY**

Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in this sale. No portion of the Purchase Price shall be attributable to such items.

17.     **NEW CONSTRUCTION**

17.1     The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications, subject to the right of Sponsor to amend the Plan and the Plans and Specification in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required).  The issuance of a Permanent Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications.  However, nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

17.2     The construction of the Building and the Unit and the correction of any defects in the construction thereof to the extent required under the Plan are the sole responsibility of Sponsor.  Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

17.3     The closing of title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Closing of Title to Units" in Part I of the Plan.  As a result, if all such prerequisites are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price (without provision for escrow), notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building or the Unit.

17.4     The actual date for the First Closing is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites recited in the Section of the Plan entitled "Closing of Title to Units."  Purchaser acknowledges that construction may be delayed by late delivery of material or equipment, labor difficulties, unavailability of Building trades, casualty, inclement weather and other events beyond Sponsor's reasonable control.  Purchaser further acknowledges that the Units in the Building will be completed at varying times over a period that could extend well beyond the First Closing.  The order in which these Units will be completed is in the discretion of Sponsor.  Purchaser acknowledges that except as otherwise provided in the Plan, Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, in the event that the First Closing occurs substantially later than the projected date or the time to complete or to close title to the Unit is delayed or is postponed by Sponsor.

18.     **INSPECTION OF THE UNIT**

18.1     Upon receipt of the Initial Closing Notice, Purchaser shall arrange an appointment with a representative of Sponsor to inspect the Unit within the 7 days prior to the Closing Date.  Purchaser or Purchaser's duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule B to this Agreement) and deliver same to Sponsor's representative at the conclusion of the inspection.  Failure of Purchaser either to arrange such appointment or to inspect the Unit within 7 days prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Balance of the Purchase Price when due and shall constitute Purchaser's full acceptance of the Unit as is.  However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

*not to exceed 3 days [*illegible*]*

18.2    Any work set forth on the Inspection Statement shall be completed by Sponsor in a reasonable period of time following the Closing and shall not be grounds for delaying the Closing. Purchaser will be required to provide Sponsor with reasonable access to the Unit subsequent to the Closing in order to complete punchlist work. Sponsor has no obligation under the Plan to deposit any monies in escrow at Closing as a result of any punchlist items.

## 19.    DAMAGE TO THE UNIT

If between the date of this Agreement and the Closing of Title the Unit is damaged by fire or other casualty, the following shall apply:

19.1    The risk of loss to the Unit by fire or other casualty until the earlier of Closing of Title or possession of the Unit by Purchaser is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the Unit. If Sponsor elects to repair or restore the Unit (which election shall be made within 60 days of the damage to the Unit), this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and, if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the Closing of Title.

19.2    In the event Sponsor notifies Purchaser that it does not elect to repair or restore the Unit (which election shall be made within 60 days of the damage to the Unit), or, if the Declaration has been recorded prior thereto, the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-laws, this Agreement shall be deemed cancelled and of no further force and effect and Sponsor shall return to Purchaser all Deposits and other sums deposited by Purchaser hereunder, together with interest earned thereon, if any, and neither party hereto shall have any further rights, obligations or liability to or against the other hereunder or under the Plan, except that if Purchaser is then in default hereunder (beyond any applicable grace period), Sponsor shall retain all Deposits and other such sums deposited by Purchaser hereunder, together with any interest earned thereon, as and for liquidated damages.

## 20.    NO REPRESENTATIONS

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocable to the Unit, the estimated real estate taxes on the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, the right to any income tax credit with respect to the purchase of the Unit, or any other data, except as herein or in the Plan specifically represented. Purchaser has relied solely on Purchaser's own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor except as herein or in the Plan specifically set forth. No oral representations or statements shall be considered a part of this Agreement. Sponsor makes no representation or warranty as to the work, materials, appliances, equipment or fixtures in the Unit, the Common Elements or any other part of the Property other than as set forth herein or in the Plan. Except as otherwise set forth in the Plan, Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the Floor Plans is accurate or correct, and (b) that Purchaser shall

not be relieved of any Purchaser's obligations hereunder by reason of any immaterial or insubstantial inaccuracy or error. The provisions of this Article shall survive the Closing of Title.

21.  **PROHIBITION AGAINST ADVERTISING**

Prior to the Closing of Title, Purchaser agrees not to list the Unit for resale or rental with any broker or to advertise or otherwise offer, promote or publicize the availability of the Unit for sale or lease, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed. Any listing of the Unit or form of advertising, promotion or publicizing of the Unit by Purchaser prior to Closing of title shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement.

22.  **BROKER**

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction other than the Selling Agent and the Co-Broker, if any, named in this Agreement, whose commissions shall be paid by Sponsor. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt, other than the Selling Agent and the Co-Broker. Purchaser agrees that, should any claim be made against Sponsor for commissions by any broker, other than the Selling Agent or the Co-Broker, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including reasonable legal fees. The provisions of this Article shall survive the Closing of Title.

23.  **AGREEMENT MAY NOT BE ASSIGNED**

Purchaser does not have the right to assign this Agreement without the prior written consent of Sponsor, which consent may be unreasonably withheld or delayed. Any purported assignment by Purchaser in violation of this Agreement will be voidable at the option of Sponsor. Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel this Agreement or give rise to any claim for damages against Sponsor. If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement, or for the addition, deletion or substitution of names on this Agreement, then Purchaser shall have such right, provided that (i) Purchaser designates such assignee at least 10 business days prior to the Closing Date; (ii) Purchaser delivers to Attorney for Sponsor the fee set forth in the Plan for its services required in connection with the preparation of the assignment and assumption agreement; (iii) the Closing is not delayed as a result of such assignment , (iv) the assignee of this Agreement assumes in writing, by an instrument prepared by Attorney for Sponsor, the obligations of Purchaser under this Agreement and (v) the assignment is made without consideration. Any purported assignment by Purchaser in violation of this Agreement shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement, and shall be voidable at the option of Sponsor.

24.  **BINDING EFFECT**

The submission of this Agreement to Purchaser does not create a binding obligation on the part of Sponsor. This Agreement shall not be binding on Sponsor until a fully executed counterpart hereof has been delivered to Purchaser or the Attorney for Purchaser. If this Agreement is not accepted within 30 days from the date hereof by the delivery to Purchaser of a fully executed counterpart, this Agreement shall be deemed to have been rejected and cancelled and the Deposit shall be promptly returned to Purchaser. Upon such refund being made, neither party shall have any further rights, obligations liability to or against the other hereunder or under the Plan. Prior to Sponsor's countersigning and returning this Agreement to Purchaser, and at any time thereafter, Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history. Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor. Sponsor has the right,

without incurring any liability, to reject this Agreement without cause or explanation to Purchaser. This Agreement may not be rejected due to Purchaser's sex, sexual orientation, race, creed, color, national origin, marital status, age, disability or other ground proscribed by Law.

## 25.    NOTICES

25.1    Any notice, election, demand, request, letter, consent or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed to the Attorney for Purchaser at the address given at the beginning of this Agreement with a copy to the Purchaser at the address given at the beginning of this Agreement by regular mail, and to the Attorney for Sponsor at the address given at the beginning of this Agreement, with a copy to Sponsor at the address given at the beginning of this Agreement by regular mail. Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent. Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected, or in the case of mailing, the 3 business days after the date of mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address. Any notice either of the parties hereto receives from the other party's attorneys shall be deemed to be notice from such party itself.

25.2    Sponsor hereby designates and empowers both the Selling Agent and Attorney for Sponsor, as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

25.3    Purchaser hereby designates and empowers the Attorney for Purchaser, as Purchaser's agent to give any notice to Sponsor under this Agreement in Purchaser's name, which notice so given shall have the same force and effect as if given by Purchaser.

## 26.    JOINT PURCHASERS

The term "Purchaser" shall be read as "Purchasers" if more than one persons are Purchasers, in which case their obligations shall be joint and several.

## 27.    LIABILITY OF SPONSOR

Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

## 28.    FURTHER ASSURANCES

Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

29.    **AGREEMENT NOT CONTINGENT UPON FINANCING**

The terms and provisions of this Agreement and Purchaser's obligations hereunder are not contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof), and Purchaser understands and agrees that Purchaser's failure to obtain such financing will not relieve Purchaser of Purchaser's obligations hereunder. Purchaser further understands and agrees that if Purchaser chooses to finance the purchase of the Unit through a lending institution and obtain a commitment therefrom, neither a subsequent change in the terms of such commitment, the expiration or other termination of such commitment, nor any change in Purchaser's financial status or condition shall release or relieve Purchaser of Purchaser's obligations pursuant to this Agreement and Sponsor shall have no liability as a result of any scheduling or adjournment of the Closing beyond the expiration of the loan commitment.

30.    **COSTS OF ENFORCING AND DEFENDING AGREEMENT**

Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.

31.    **SEVERABILITY**

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

32.    **STRICT COMPLIANCE**

Any failure by either party to insist upon the strict performance by the other of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such party.

33.    **GOVERNING LAW**

The provisions of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

34.    **WAIVER OF JURY**

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, or connected with, or relating to, this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

35.    **ENTIRE AGREEMENT**

This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

36.   **CERTAIN REFERENCES**

A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires. The terms "herein," "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used, unless the context otherwise requires. Unless otherwise stated, all references herein to Articles, Sections, subsections or other provisions are references to Articles, Sections, subsections or other provisions of this Agreement.

37.   **CAPTIONS**

The captions in this Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

38.   **SUCCESSORS AND ASSIGNS**

The provisions of this Agreement shall bind and enure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and enure to the benefit of Sponsor and its successors and assigns.

39.   **CONFIDENTIALITY**

Sponsor and Purchaser hereby acknowledge and agree to keep all of the terms and conditions of this Agreement confidential. Sponsor and Purchaser agree that any information which is required to be disclosed to the parties respective lawyers, architects/engineers, accountants, individuals who "need to know" or governmental agencies shall not be deemed to be a breach by Sponsor or Purchaser of the parties undertaking of confidentiality contained in this Agreement. Any failure by Purchaser to keep the terms and conditions of this Agreement confidential shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement.

40.   ~~**LETTER OF CREDIT**~~ **IN LIEU OF DEPOSITS IN ESCROW**

Purchaser acknowledges and agrees that Sponsor has the right, in its sole discretion, to elect to withdraw the Deposit and secure it with a Letter of Credit as more fully set forth in the Plan and Purchaser hereby consents to such withdrawal of the funds from escrow.

41.   **NO ORAL CHANGES**

This Agreement cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by the parties hereto or by an amendment to the plan.

42.   **PERFORMANCE**

Where this Agreement by its terms requires the payment of money or the performance of a condition on a Saturday, Sunday or public holiday, such payment may be made or condition performed on the next business day succeeding such Saturday, Sunday or such public holiday, with the same force and effect as if made or performed in accordance with the terms of this Agreement.

43.     **COUNTERPARTS**

        This Agreement may be executed in any number of counterparts.  Each such counterpart shall for all purposes be deemed an original.  All such counterparts shall together constitute but one and the same Agreement.

44.     **WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY.**

        43.1     The provisions of this Article shall survive the Closing of Title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement.

        43.2     If Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to diplomatic or sovereign immunity, Purchaser hereby designates a duly authorized and lawful agent to receive process for and on behalf of Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement or the Condominium Documents.

        43.3     If Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. Section 4305, Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor.  Sponsor shall not be bound under this Agreement unless and until the earlier to occur of:  (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after Purchaser's notice is received by the Department of State.

        IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PURCHASER(S):

GABRIEL MEYASSED

ESTHER MEYASSED

SPONSOR:

LEV PARKVIEW DEVELOPERS LLC

By:  Parkview 47 LLC, a member

By: _____
    Ron Yeffet, Manager

AND

By:  Parkview Developers, LLC, a Manager

By: _____
    Mati Weiderpass or Ian Reisner, Managers

## SCHEDULE A

## PERMITTED ENCUMBRANCES

1.  Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2.  As to the Land: State of facts shown on survey made by Angelo J. Fiorenza, P.L.S. dated September 27, 2005 as updated by visual examination on November 25, 2006 and last revised on December 6, 2006 and state of facts shown on any update or revision of such survey; and as to the Unit: Any state of facts which an accurate survey or personal inspection of the Property would show, provided such state of facts would not prevent the use of the Unit for dwelling purposes. *insuring from title Co.*

3.  The terms, burdens, covenants, restrictions, conditions, easements and Rules and Regulations, all as set forth in the Declaration, the By-laws (and the Rules and Regulations made thereunder), the Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

4.  Consents by Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5.  Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

6.  Revocability of licenses for vault space, if any, under the sidewalks and streets.

7.  Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

8.  Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

9.  Leases and service, maintenance, employment, concessionaire and Ancillary Amenity Licenses, if any, of other Units or portions of the Common Elements.

10. The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the Closing of Title. *and paid to date at closing have*

11. The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

12. Any declaration or other instrument affecting the Property which Sponsor deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

13.  Any encumbrance as to which the Title Company (or such other New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Unit) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such encumbrance (a) will not be collected out of the Unit if it is a lien or (b) will not be enforced against the Unit if it is not a lien. Nor against the common areas.

14.  Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for dwelling purposes.

15.  Any lease covering the Unit(s) made from Sponsor to the Purchaser.

16.  Any violation against the Property (other than the Unit) which is the obligation of the Condominium Board, or another Unit Owner to correct.

17.  Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company.

18.  Any Temporary or Permanent Certificate of Occupancy for the Building, so long as the same permits, or does not prohibit, use of the Unit for its stated purposes.

19.  Any encumbrance, covenant, easement, agreement, or restriction against the Property set forth in the form of Unit Owner's Specimen Title Policy prepared by the Title Company set forth in Part II of the Plan, as the same may be updated from time to time prior to Closing.

20.  Terms, conditions, restriction, reservations and easements contained in prior deeds to the Property, concerning railroad rights-of-way and railroad operations, as such easements may be modified prior to Closing.

21.  Covenants and Restrictions of Non-Exclusive Easement made by Consolidated Rail Corporation to National Railroad Passenger Corporation dated January 10, 1986 and recorded May 6,1986 in Reel 1059 Page 1108.

22.  Agreement of Covenants and Easements between National Railroad Passenger Corporation and Sponsor, as such agreement may be amended or modified prior to Closing.

## SCHEDULE B

## INSPECTION STATEMENT

Date: _____

Lev Parkview Developers, LLC
1230 Avenue of the Americas, 7th Floor
New York, New York 10020

Re:    Unit No: 5E-N ("Unit")
        The 505 Condominium
        505 West 47th Street
        New York, New York 10036 ("Condominium")

Ladies and Gentlemen:

1.    On the date hereof, the undersigned purchaser(s) ("Purchaser") inspected the Unit which Purchaser is acquiring from Sponsor and have found the Unit to be in good condition, except as otherwise noted below.

2.    Purchaser acknowledges that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, kitchen cabinets, vanity knobs and mechanical chimes will be installed just prior to the date Purchaser moves into the Building. Purchaser agrees to sign-off each item requiring adjustment, or repairs, if any, as they are completed.

3.    In the event Purchaser performs work in the Unit of any kind affecting any of the areas or items listed above after the Closing, Sponsor will be relieved of any and all obligations related to the items listed herein.

PURCHASER(S):

_____
(signature)

_____
(signature)

_____
Sponsor's Representative

105 West 60th Street
New York, New York 10036

## 1.   OUTSIDE CLOSING DATE

In the event Sponsor fails to close title to the Unit with Purchaser by June 1, 2010 ("Outside Closing Date") through no fault of Purchaser or Purchaser's lending institution or representatives, Purchaser shall have the right to terminate the Purchase Agreement by delivering a rescission notice to Sponsor within 15 days after the Outside Closing Date, failing which the Purchase Agreement shall remain in full force and effect. If Purchaser timely elects to terminate the Purchase Agreement, Sponsor shall, within 30 days after receipt of notice of termination from Purchaser, return to Purchaser all sums deposited by Purchaser under the Purchase Agreement, together with interest earned thereon, if any. Upon making such payment, the Purchase Agreement shall be terminated and neither party shall have any further rights, obligations or liability to or against the other under the Purchase Agreement or the Plan.

## 2.   ASSIGNMENT OF PURCHASE AGREEMENT BY AN INDIVIDUAL TO AN ENTITY

1.1     Notwithstanding anything to the contrary contained in Paragraph 23 of the Purchase Agreement, Purchaser shall have the right at Closing to assign Purchaser's rights under the Purchase Agreement, in whole, but not in part, to an entity which is under the Control (defined below) of, Purchaser or Purchaser's spouse, adult child(ren), parent(s) or in-law(s) (each a "Controlling Individual") provided (i) Purchaser designates such assignee at least 20 days prior to Closing, time being of the essence; (ii) the Closing will not be delayed as a result of the assignment; (iii) the assignee assumes in writing, by an instrument prepared by Attorneys for Sponsor, the obligations of Purchaser under the Purchase Agreement, which instrument shall provide that the original-named Purchaser, and any assignee thereof, shall remain fully and primarily liable for all of the obligations of Purchaser under the Purchase Agreement; (iv) Purchaser delivers to Attorneys for Sponsor a fee in the amount set forth in the Plan for its services rendered in connection with the preparation of the assignment and assumption agreement; (v) the assignee is an entity organized and existing under the laws of the United States, is in good standing, is under the Control of a Controlling Individual of good character and reputation and has sufficient net worth to meet its liabilities and obligations under the assignment and assumption agreement and Purchase Agreement, which facts assignee can establish through written evidence, to Sponsor's satisfaction, in Sponsor's sole and absolute discretion; (vi) the assignment is made without consideration; and (vii) Purchaser shall not be in default under the Purchase Agreement. Unless Purchaser complies with the provisions of this Paragraph, any purported assignment by Purchaser shall be null and void and of no effect as against Sponsor and, at Sponsor's election, shall be deemed an event of default under the Purchase Agreement, entitling Sponsor to exercise the remedies set forth in Article 13 of the Purchase Agreement.

5E-N Rider (CH0002)[1]

Supplementing and modifying subparagraph 6.1 of the Purchase Agreement, the last sentence of the subparagraph shall read "Sponsor may from time to time, adjourn the date and hour for Closing on not less than 15 days notice to Purchaser ("Adjournment Notice"), which Adjournment Notice shall fix a new date, hour and place for Closing.

4.    **LATE CLOSING PENALTY**

Supplementing and modifying subparagraph 9.4 of the Purchase Agreement, the provisions of (a) and (b) shall apply only if Purchaser fails to close title to the Unit within 10 days of the originally scheduled Closing Date.

5.    **DEFINITIONS**

All capitalized terms used in this Rider not defined herein shall have the same meanings ascribed to them in the Purchase Agreement to which this Rider is annexed or in the Plan.

6.    **CONFLICTS**

In the event of any inconsistency between the provisions of this Rider and those contained in the Purchase Agreement to which this Rider is annexed, the provisions of this Rider shall govern and be binding.

7.    **FULL FORCE AND EFFECT**

Except as set forth in this Rider, all of the terms and conditions of the Purchase Agreement remain unchanged and in full force and effect.

*****

PURCHASERS:

_____
Gabriel Meyassed

_____
Esther Meyassed

**SPONSOR:**

LEV PARKVIEW DEVELOPERS LLC

By:  Parkview 47 LLC, a member

By: _____
Ron Yeffet, Manager

**AND**

By:  Parkview Developers, LLC, a Manager

By: _____
Mati Weiderpass or Ian Reisner, Managers

5E-N Rider (CH0002)[1]

3